IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SEAN E. EDWARDS,                 )
                                 )
                Plaintiff,       )
                                 )
vs.                              )          Case No. 13-0729-CV-W-ODS
                                 )
LORETTA LYNCH,[1]                )
ATTORNEY GENERAL,                )
UNITED STATES DEPARTMENT         )
OF JUSTICE,                      )
                                 )
                Defendant.       )

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND JUDGMENT IN FAVOR OF DEFENDANT

        Plaintiff, an FBI agent, filed a two-count Complaint alleging that he was subjected
to discrimination based on his gender and that he was subjected to unlawful retaliation.
There is a dispute as to whether Plaintiff has also asserted a claim for hostile work
environment: neither of the two counts explicitly asserts a claim for hostile work
environment, but some of the factual allegations assert that a hostile work environment
existed.  E.g., Complaint, ¶ 18, 22.  The Court will discuss below whether Plaintiff has
properly advanced a theory predicated on the existence of a hostile work environment.
For present purposes the important point is that all of Plaintiff's claims arise under Title
VII of the Civil Rights Act.

        A bench trial was held the week of May 4, 2015.  As explained more fully below,
the Court finds in Defendant's favor.

_____

        [1]Loretta Lynch is substituted as the Defendant pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure.  The Clerk of Court is directed to change the Docket
Sheet accordingly.

<u>I.  FACTUAL FINDINGS</u>

The Court finds the following facts have been proved by the greater weight of the evidence.  In setting forth its findings, the Court will not parse out each piece of evidence or testimony on a point and will only occasionally indicate the evidentiary support for the facts set forth.  It should be understood that any conflict in the evidence has been resolved in the manner described below.

<u>A.  General Background</u>

The Court begins with a brief description of the structure of the FBI's Kansas City field office.  This subsection also describes facts that form a backdrop to the specific events addressed in the ensuing subsections.

During the relevant time period, the person in charge of the Kansas City division was Special Agent in Charge ("SAC") Brian Truchon.  Reporting to SAC Truchon were two or three Assistant Special Agents in Charge ("ASACs").  At the outset of the relevant time period there were two: ASAC Daniel Jones and ASAC John Cataldi.  ASAC Eric Jackson joined ASACs Jones and Cataldi in May 2011.  The office was divided into approximately twenty different squads, and the manner in which the ASACs divided supervisory responsibility varied over time.  Each squad was supervised by a Supervisory Special Agent ("SSA"), who reported to the ASACs.

Plaintiff joined the FBI in 1999, and from 2003 until the Fall of 2007 he was assigned to the Albuquerque, New Mexico office.  While there he was trained as a pilot and occasionally flew surveillance as part of his duties.  In the Fall of 2007 he transferred from Albuquerque to Kansas City because Kansas City's surveillance squad was in need of pilots.  The surveillance squad – also referred to as "Squad Six" – consisted of two units or groups.  The names of these groups changed during the events in question, and for the sake of convenience the Court will utilize their new/current names.  One unit was the Mobile Surveillance Team – Armed ("MST-A") and the other was the Mobile Surveillance Team ("MST").  The units consisted of ground personnel, who were assigned to either MST or MST-A, and pilots, who at

2

various times flew in support of either MST, MST-A, or both. On occasion, the pilots were also assigned duties on the ground. However, in 2010, Plaintiff and another pilot (Keith Whitnah) were assigned to flying full-time; other agents (Lonnie Cox, Bruce Contess, and Alex Menzel) flew part-time.

Julie Bulman was an agent who transferred to Kansas City in 2009 and was assigned to MST-A. In February or March 2010, Plaintiff, Plaintiff's wife (Tonda Edwards),[2] and Bulman began a romantic relationship with each other. The relationship ended in July 2010. While one usually expects a certain amount of emotion at the conclusion of a romantic relationship, this breakup engendered a rather high degree of anger and resentment. The Court finds that after the breakup Plaintiff began disparaging Bulman to other agents, including other agents on Squad Six. Bulman may have also disparaged Plaintiff to other agents, including other agents on Squad Six; the evidence is not clear as to whether she did so between July and October 2010, but that fact is not terribly important.

Text messages reveal that Plaintiff and Tonda also continued discussing Bulman in disparaging terms, and at times the pair appeared to revel in Bulman's discomfort and unhappiness. This led to the events of October 2010: Bulman's ex-husband (Alex Meriano, himself an FBI agent) invited Plaintiff's and Tonda's son to a birthday party for Bulman's and Meriano's daughter to be held near the end of October. Plaintiff and Tonda discussed plans to attend in the hopes that this would cause Bulman discomfort. E.g., Defendant's Exhibit 9, pages 77-78. Whether their attendance had the desired effect is unclear and unimportant: the fact is that Plaintiff and Tonda attended the party and while there Tonda became upset or irritated with Bulman and thereafter resolved to harm her in some way. Tonda knew, from prior discussions with Bulman, that Bulman used her FBI car to take her children to school, which Tonda knew was a violation of FBI regulations. Thus it was that Tonda staked out the front of Bulman's children's school and videotaped this transgression, and on or about October 29 she sent an anonymous complaint with the videotape to the FBI's Office of Professional Responsibility ("OPR") in Washington, D.C.

---

[2]For ease of discussion, Plaintiff's wife will henceforth be referred to as "Tonda." It should also be noted that Tonda is not an FBI agent.

Plaintiff and Tonda insist that Tonda "acted alone" and without Plaintiff's prior knowledge. The Court is not entirely convinced of Plaintiff's ignorance, but it really does not matter whether Plaintiff knew what Tonda intended before she sent the OPR complaint. The Court will say this: Tonda's testimony notwithstanding, the Court does not believe – not for one moment – that Tonda acted out of altruism, out of a taxpayer's concern about improper activity by a government employee, out of a heartfelt belief about how a well-run organization should operate, or even out of some notion she was "doing the right thing." Tonda acted out of spite; out of personal animosity toward Bulman; out of a desire to cause harm and inconvenience to Bulman. The fact that Tonda was correct and that Bulman was violating FBI policy does not alter this conclusion.

When a complaint is received, the OPR has the option of (1) referring the matter to the local office for resolution or (2) handling the matter itself with varying levels of involvement by the local field office. In this case, the decision was made to handle the matter from Washington, and the process when such a decision is made is to notify the local field office with instructions to notify the agent of the OPR complaint. The local office also has some responsibility for gathering certain information and forwarding it to Washington. Thus, in early November 2010 notice of the OPR complaint was sent to SAC Truchon, who sent word down the chain of command to notify Bulman of the OPR complaint and of the fact that he needed to talk to her about it. SSA Moore advised Bulman of the OPR complaint and its contents: a letter accusing her of using her FBI car to take her children to school and videotapes of her doing so. Perhaps Bulman recalled that Tonda (as Tonda explained in her testimony) had previously counseled her against using her FBI car to take her children to school. Perhaps Bulman reacted to the ongoing emotions following the break-up and the recent incidents at her daughter's birthday party to simply assume Plaintiff's and Tonda's involvement. Regardless, Bulman made the correct connections and told SSA Moore that Plaintiff or Tonda or both were responsible for the OPR complaint. Bulman also admitted the violation, and in January 2011 OPR meted out a one day suspension as punishment.

Unsurprisingly, the OPR complaint intensified hostilities between Plaintiff and Bulman. Both Plaintiff and Bulman were instructed not to discuss the OPR complaint

with fellow agents. Nonetheless, Bulman regularly complained to SSA Moore (who already knew about the OPR complaint) that Plaintiff was following, stalking, and bad-mouthing her to other agents. The latter complaint was certainly true.[3] Plaintiff also regularly complained to SSA Moore about Bulman. The Court credits SSA Moore's testimony that both Bulman and Plaintiff complained to him about the other on a regular basis. The Court also finds that both of them had several discussions with ASAC Cataldi. While not necessarily divulging the OPR complaint's existence, Plaintiff and Bulman also expressed their negative feelings about each other to other members of Squad Six. The Court finds that the conflicts between Plaintiff and Bulman were noticeable to, and having a negative effect on, Squad Six, and at times squad members complained to SSA Moore. As SSA Moore described matters, it appeared the members of Squad Six were choosing sides. Other witnesses testified to these facts, and the Court finds the testimony of ASAC Cataldi, SSA Moore, and Special Agent Lonnie Cox (the Team Leader for MST-A) particularly credible on this point. These problems infected Squad Six from the time Bulman learned of the OPR complaint through at least the time of Plaintiff's transfer and were a frequent topic of discussion between SAC Moore and the ASACs and between the ASACs and SAC Truchon. For a time, SSA Moore tried to resolve these problems by having Plaintiff fly only with MST, which was an effort to separate Plaintiff from Bulman and the rest of MST-A. This required Plaintiff to fly more on weekends and nights than he had previously. However, at some point (possibly sometime in March 2011) Plaintiff was allowed to resume flying with MST-A.

---

[3]Plaintiff makes much of Bulman's accusation that Plaintiff followed and stalked her. Three findings put Bulman's characterization in perspective. First, Bulman may not have known about Plaintiff's insistence that he knew nothing about the OPR complaint Tonda filed, and if she did she was not obligated to believe it. Second, using the words "stalking" and "following" to describe an incident in which someone has staked out another person delivering their children to school and videotaped the events is a fair use of those terms. Third, the Court does not understand Bulman to have been complaining about multiple events of stalking and following, nor does the Court understand any of the witnesses to have interpreted Bulman as complaining about multiple events. All such complaints were references to the OPR complaint and the videotape of her delivering her children to school. Bulman appears to have simply lodged the same complaint repeatedly (and perhaps excessively, as those who feel wounded in a personal relationship often do).

5

Plaintiff's gender played no part in SSA Moore's decision to assign Plaintiff to fly with MST.

## B. The QSI

Meanwhile, in October 2010 the Kansas City office was told the number of Quality Step Increases ("QSIs") that could be awarded for the year. A QSI is a monetary performance award that moves a federal employee up the pay schedule to the next step earlier than the employee would otherwise move up the schedule. A limited number of QSIs are permitted to each field office each year, and the number permitted is established by FBI HQ in Washington. To determine who in Kansas City would receive a QSI, nominations were solicited from the SSAs. The total number of nominations would naturally exceed the number of QSIs permitted, so the nominations were then considered by the ASACs. The ASACs pared the SSAs' nominations to the number allotted, taking into account each nominee's performance and the need to balance the QSIs amongst the various squads and between agents and non-agents. The ASACs forwarded their recommendations to SAC Truchon, who was responsible for making the final decision and ultimately submitting the names to Washington (where the individuals would be subjected to further review; for example, to determine if there were any outstanding OPR complaints that the local office might not be aware of).

SSA Moore nominated Plaintiff for a QSI in October 2010, and Plaintiff's name was eventually forwarded by the ASACs to SAC Truchon, but SAC Truchon did not approve Plaintiff for a QSI and did not forward Plaintiff's name to Washington. By the time Truchon was considering who to formally approve, he had already been involved in discussions with the ASACs about the difficulties on Squad Six. Based on his continued discussion with the ASACs, SAC Truchon believed Plaintiff bore some responsibility for the continued difficulties on Squad Six and thought it would be wrong to reward him with a QSI. Plaintiff's gender played no part in SAC Truchon's decision not to submit Plaintiff for a QSI.

## C.  The Principal Relief Supervisor Position

In December 2010, a position for principal relief supervisor for Squad Six was posted.  The applicants were to be reviewed by the Career Board and a recommendation made to SAC Truchon.  Plaintiff was the only applicant, and the position was recanvassed in mid-January 2011.  Recanvassing routinely occurs when only one person applies for a posting in order to provide the Career Board with choices to compare, and this is why the position was reposted on this occasion.  Plaintiff did not specifically respond to the recanvassing, but he did not have to: as the recanvassing was intended to elicit additional applicants, his application in response to the original posting carried over for consideration with any other applications submitted in response to the recanvassing.  In mid-February 2011 the Career Board recommended to SAC Truchon that he select Plaintiff as the principal relief supervisor for Squad Six, and he did.  Plaintiff's gender played no part in decision to repost the position.

After Plaintiff was selected for the principal relief supervisor position, SSA Moore (and possibly ASAC Cataldi) cautioned Plaintiff that he would have to treat Bulman fairly.  Separately, Bulman expressed concerns that Plaintiff would have access to her personnel file.  She was told this would not be the case.  Bulman also shared her displeasure at Plaintiff's selection with other agents.

## D.  The Mediation

In February 2011, one of the ASACs suggested soliciting the services of a mediator to help resolve the conflicts between Plaintiff and Bulman.  Details about the origination of this plan are not terribly important, but the evidence suggests ASAC Cataldi or ASAC Jones directed SSA Moore to try to persuade the two parties to agree to the effort.  Plaintiff makes much of the fact that some of the communications refer to this as an "EEO mediation" even though nobody (including Plaintiff and Bulman) had filed an EEO complaint.  Despite the phrasing, the Court finds this was not an EEO mediation; it was an "ordinary" mediation that was similar to mediation efforts the FBI used in other instances to resolve workplace differences.  Faced with a situation in

7

which two agents had allowed their personal lives to spill into and detrimentally affect the FBI's operations, the FBI hoped the mediation would allow the principals to clear the air and restore normalcy. Such an effort did not require an EEO complaint to be filed.

The mediation was not desired by either party. Bulman did not suggest it and did not want to attend. The evidence does not establish whether she would have attended because Plaintiff expressed that he would not attend. Without both participants there was no point in having mediation, so one was never held.

Plaintiff also makes much of the fact that SSA Moore wrote in an e-mail to Plaintiff that if he "opt[ed] out of the meeting we will proceed without you and your voice will not be heard." Joint Ex. 5. The Court does not know whether SSA Moore intended this as an attempt to cajole Plaintiff into participating or if it was an error on SSA Moore's part; the salient point remains that the mediation did not occur and nobody suffered any repercussions (other than the lost opportunity to resolve this mess) for failing to participate.

### E.  Bulman's Demand that OPR Complaints Be Filed

In February 2011, a meeting was held between Bulman, ASAC Cataldi, and EEO Coordinator Melika Matthews. At the meeting, Bulman reiterated her unhappiness about the OPR complaint from October 2010 and further complained that she was afraid of Plaintiff because of their break-up and because he had violent tendencies. This was one of the meetings (if not the only meeting) in which she expressed concern about Plaintiff's selection as Principal Relief Supervisor. Bulman also alleged that OPR complaints should be filed against Plaintiff for a variety of reasons, including that he allegedly

- Supervised a non-agent (Tonda) in conducting surveillance (a reference to Tonda's videotaping of Bulman),
- Included false statements in the OPR complaint,
- Either (1) lied about his lack of prior knowledge of the OPR complaint or (2) violated FBI regulations by failing to report her use of the FBI car on his own, and
- Engaged in unauthorized outside employment.

8

ASAC Cataldi offered to recommend to SAC Truchon that Bulman be transferred off of MST-A, but Bulman declined. She rejected the offer for a variety of reasons, including her belief that a transfer would not provide her much protection from Plaintiff and her interpretation of ASAC Cataldi's tone. To paraphrase Bulman's testimony, ASAC Cataldi's offer was made in an accusatory and unsympathetic manner.

Nobody filed an OPR complaint against Plaintiff. Bulman was not transferred.

## F. The Squad Six Picnic and Its Immediate Aftermath

On Friday, June 3, 2011 Squad Six had a squad-wide picnic. Bulman attended and brought her children. Plaintiff also attended. At some point – probably shortly after the picnic ended – Plaintiff had a conversation with another attendee in which the other agent reported to Plaintiff some statements made by Meriano[4] about Bulman's boyfriend, Jeff Klein. Plaintiff reported these statements to Tonda, who took it upon herself to communicate with Meriano about Klein. Her message to Meriano suggested that his "fears" and "concerns" – whatever they may have been – were valid, and that he should look into Klein's business. Once again, while not terribly important to the outcome, the Court does not believe Tonda's insistence that she acted out of a concern for Bulman's and Meriano's children – Tonda was trying to create difficulty for Bulman. And, for what it's worth, this was Meriano's sense as well.[5] Meriano complained to Moore about Tonda's uninvited meddling, and Moore told Meriano he would take care of it. Moore called and talked to both Plaintiff and Tonda the next day, which was a Saturday. Moore reported this incident up the chain of command.

The following Monday, Plaintiff sent an e-mail to Ray Errington, the Chief Security Officer, reporting "the creation of three fraudulent social networking profiles created" on an adult lifestyle website using the names of Plaintiff and Tonda. Errington

---

[4]It is not clear when Meriano and the other agent had this conversation; Meriano was not a member of Squad Six and was not at the picnic.

[5]Tonda was able to contact Meriano only because the two had exchanged phone numbers in October 2010 so they could coordinate their children going to a Halloween event. Tonda's phone number now remains in Meriano's phone only so that he can block it. They did not regularly converse or associate.

initially thought Plaintiff was reporting an issue of identity theft, but Plaintiff made clear his belief that this was a targeted act conducted by, or with the assistance, of an employee. Later that day Plaintiff met with Errington and ASAC Cataldi: during the meeting, Plaintiff was insistent that something be done about Bulman, and his exhortations were out of proportion to the circumstances. Based on Plaintiff's admission, the Court believes Plaintiff was concerned that Tonda's contact with Meriano would look badly for him; the Court further finds Plaintiff was attempting to raise as many issues about Bulman as possible in order to divert attention from Tonda's message and from himself. He made clear his belief that Bulman was the employee involved in the false profiles' creation. He also complained that Bulman was engaged in unauthorized outside work at an adult club called The Spott, and moreover that illegal drug activity occurred there. For proof, Plaintiff presented pictures taken from The Spott's website that he claimed were pictures of Bulman. Cataldi testified that the pictures could have been anyone, and the Court agrees; none of the pictures depict the female's face, and there is nothing to indicate the person depicted is Bulman. In fact, if Bulman had not testified that the pictures were "more likely than not" her, the Court would have no real basis for believing they were. Regardless, the pictures do not show the subject's face, do not reveal anything about The Spott, do not indicate the person depicted was working at The Spott, and do not indicate Plaintiff was working at The Spott. It is even arguable whether the pictures depict anything the FBI would be concerned about. Plaintiff also provided the name of a person who could confirm the existence of drug activity. ASAC Cataldi directed Errington to look into the matter and passed the information on to ASAC Jones and SAC Truchon.

Plaintiff had already sent an e-mail to the website administrator directing that the profiles be removed. There is no evidence as to whether this happened or not. Plaintiff provided the e-mails to Errington, who did nothing more because he did believe there was anything else he could do. There is also no evidence as to how the profiles came to exist, much less any evidence that Bulman was involved. There was some question about whether Errington could have taken advantage of the FBI's cyber investigation tools; ASAC Cataldi intimated that the FBI's formal powers of investigation can only be

used to investigate crimes and cannot be used to investigate employment matters that fall short of federal crimes.

After consulting with ASAC Jones, the issue of drug activity at The Spott was referred to local law enforcement authorities. In the interim, Errington traded messages with the witness Plaintiff identified as being able to confirm the presence of drug activity; eventually, those exchanges ended without Errington personally talking to the witness because Errington had referred the matter to local law enforcement. There was no evidence indicating whether or not Errington (1) provided the witness's name to the local authorities or (2) left a message directing the witness to contact the other agencies, so the Court cannot make a finding on these matters.

Errington also interviewed Bulman to determine if she had violated FBI regulations regarding outside employment. She explained that she was dating The Spott's owner, and that The Spott was a facility that could be rented for a variety of gatherings including weddings, children's parties, and other events, and that one night a week the Kansas City Swingers Club rented the facility. Bulman also confirmed that she frequented The Spott with her boyfriend but typically stayed with him in the office – although she might occasionally fill the potato chip bowl. She denied seeing any evidence of drugs, identified the woman in the pictures provided by Plaintiff as her boyfriend's ex-wife, and further denied working at The Spott. Some or all of Plaintiff's statements to Errington may have been lies; if they were Errington did not recognize them as such, and if there were any lies it is not clear which ones (beyond the issue of outside employment and illegal activity) would have resulted in further action. Regardless, no disciplinary action was taken against Bulman.[6]

### G.  Employee Assistance Program

The FBI operates an Employee Assistance Program ("EAP"); the EAP coordinator in the Kansas City office is Bonnie Schmidt. Schmidt is also a paralegal;

---

[6]Plaintiff invites the Court to make a number of findings regarding Errington's and Bulman's friendship/relationship that are not supported by the evidence so the Court will not detail them, preferring to allow its findings to stand on their own.

11

however, she is not a counselor.  Her role as EAP coordinator involves ascertaining an employee's needs and directing them to professionals who can fulfill those needs.  Even though she is not a counselor some employees erroneously use her as such and vent their problems and frustrations to her.

Bulman first contacted Schmidt the day she learned of the OPR complaint.  Her purpose for meeting with Schmidt was twofold.  First, she wanted to know about the process and possible punishments.  Second, she vented her beliefs that Plaintiff was responsible for the OPR complaint.  Schmidt addressed her questions about the OPR process and the possible penalties.  Schmidt also referred Bulman to a specialist to help deal with her stress.  Plaintiff went to Schmidt on several other occasions to vent.

After meeting with ASAC Cataldi in February 2011 and demanding that OPR complaints be filed against Plaintiff, Bulman sent Schmidt a draft of a letter summarizing that meeting.  However, Schmidt had no recollection of the purpose for Bulman sending the letter, and testified it may have been sent to her in her capacity as a paralegal as part of Bulman's inquiry as to who could file an OPR complaint.  Regardless, Schmidt did not make any recommendations to or otherwise respond to Bulman's draft, nor did she discuss the matter with ASAC Cataldi.

Schmidt met with Plaintiff following his June 2011 meeting with Errington and ASAC Cataldi.  According to Plaintiff, he had mentioned he was having difficulty sleeping and ASAC Cataldi suggested to Plaintiff that he talk to Schmidt.  It appears Plaintiff (like some other FBI employees) misapprehended Schmidt's role and presumed she was a counselor.  Plaintiff's meeting with Schmidt lasted several hours, during which time he expressed anger at a great many people: Bulman, Klein, Tonda, SSA Moore, and others.  To Schmidt, it appeared Plaintiff was complaining about what others had done to him.  Schmidt suggested Plaintiff might benefit from anger management counseling, but Plaintiff declined the referral and indicated he was seeing a doctor on his own.  During the meeting Schmidt felt threatened to a certain degree and felt that Plaintiff's energy and fidgeting brought him closer to her than she would have liked.  These matters are, of course, difficult to quantify, but the Court credits Schmidt's testimony that she felt this way.

12

Altogether, Schmidt and Bulman met five or six times.  Plaintiff invites the Court to make a number of findings regarding their relationship that are not supported by the evidence so the Court will not detail them, preferring to allow its findings to stand on their own.  Plaintiff also invites the Court to find Schmidt harbored personal animosity or bias toward Plaintiff because she had been conditioned to do so from Bulman's complaints; the Court rejects this characterization of the evidence.

<u>H.  Plaintiff's Transfer and Aftermath</u>

<u>*1.*</u>

At some point, probably commencing in early 2011, SAC Truchon's ongoing conversations with the ASACs included regular discussions about whether the best solution to the continuing problems was to transfer Plaintiff, Bulman, or both.  The decision was SAC Truchon's to make, and he was reluctant to transfer both out of concern as to how that much personnel change would affect Squad Six.  However, at some point after the picnic and its aftermath it became clear to SAC Truchon that either Plaintiff or Bulman would have to be transferred.

SAC Truchon opted to transfer Plaintiff.  In making this decision, SAC Truchon acknowledged Plaintiff's skills as a pilot and the fact that as a pilot Plaintiff was more difficult to replace.  However, SAC Truchon viewed Plaintiff as more responsible for the workplace drama than Bulman.  SAC Truchon believed Bulman complained primarily to supervisors while Plaintiff complained more to other members of Squad Six.  He viewed Bulman as following his instructions and Plaintiff as not.  Concern had also been expressed to SAC Truchon (probably by ASAC Cataldi) regarding what was viewed as Plaintiff's unfounded and unsubstantiated accusations against Bulman in June 2011.  SAC Truchon also found Tonda's communications to Meriano about Bulman and Klein to be a troublesome indication that the dysfunction was escalating, regardless of whether this was because (1) Plaintiff had a hand in Tonda's communication or (2) Plaintiff could not prevent Tonda from meddling; either way, SAC Truchon placed the blame for this on Plaintiff and not Bulman.

13

On or about June 30, 2011 Plaintiff was transferred to the Domestic Terrorism Unit, with the transfer effective July 3. The Domestic Terrorism Unit was chosen for a variety of reasons, including: (1) ASAC Jackson's suggestion that a transfer to Domestic Terrorism would provide a good opportunity for Plaintiff to work on a clean slate, (2) Plaintiff's prior experience, and (3) the fact that Plaintiff's work effort and ability were not in question.

<u>2.</u>

Plaintiff's transfer required him to work in a Sensitive Compartmented Information Facility ("SCIF"), and anyone transferring to the SCIF was required by FBI policy to undergo a polygraph examination to obtain Sensitive Compartmented Information ("SCI") clearance, which is a special clearance above what the rank and file FBI agent is required to possess. While a polygrapher was assigned to the Kansas City Office (Dirk Tarpley), a polygrapher from another office is typically called upon to perform tests for internal matters (such as tests for SCI clearance). In this case, the polygraph was performed by Kelly Kenser. And, because of the nature of polygraph and how it works, it is required that the polygrapher have background information and other data that might affect the subject's stress levels. In this case, Kenser knew (from information provided either by Tarpley or Errington) about the relationship between Plaintiff and Bulman and that this contributed to the reason for Plaintiff's transfer to the Domestic Terrorism Unit. Plaintiff also told Kenser about medication that he was taking. Unfortunately, earlier on the day of the polygraph Plaintiff learned his mother was undergoing an emergency heart procedure in St. Louis. Plaintiff waited until the polygraph could be administered before going – but Plaintiff did not tell Kenser about his mother's situation or that he was in a rush to get to St. Louis. The Court credits Kenser's testimony on this point, and finds it persuasive because this sort of information would have been important to Kenser and if Plaintiff had told Kenser these facts Kenser would have written them in his notes.

Kenser's assessment was that Plaintiff was not deceptive during the polygraph. However, Kenser was concerned about Plaintiff's stress levels. Kenser noted Plaintiff

appeared unusually nervous, exhibited an elevated heart rate, appeared to be sweating and breathing hard, and that his demeanor suggested a high degree of anxiety. While some stress is commonly exhibited by subjects taking a polygraph, Plaintiff's signs were sufficiently atypical that Kenser reported his observations out of a concern for Plaintiff's well-being, not because Plaintiff was a male. While the evidence is not clear whether Kenser told Errington, Tarpley, or both, it is clear that he told some combination of the two, and that Errington learned of Kenser's observations either from Kenser directly or from Tarpley. Errington contacted Schmidt because of the possible EAP ramifications of Plaintiff's apparent anxiety/stress issues, and Errington, Schmidt and Tarpley met with ASAC Jackson. During the meeting, matters discussed included: Kenser's observations, Bulman's concerns for her safety, Schmidt's observations from her June meeting with Plaintiff, and information that had been conveyed from other agents. Included in this latter category was information Contess previously provided to ASAC Jackson wherein Contess expressed concern that Plaintiff exhibited emotional issues. ASAC Jackson discussed the matter with SAC Truchon, and after much discussion SAC Truchon directed ASAC Jackson to ask the Health Care Programs Unit ("HCPU") in Washington to determine whether a fitness for duty examination ("FFD") was called for. ASAC Jackson complied and on July 11 completed the necessary communication directed to HCPU. This communication (referred to by the parties as "Serial 44") was also directed to the Analysis and Investigations Unit ("AIU") for its information. Much was made of this latter fact during the trial, but the Court finds that FBI procedures *required* that the AIU be copied on this communication, so there was nothing untoward about this action. Plaintiff's gender played no role in the decision to send the Serial 44.

While the HCPU evaluated the Serial 44 (and supplemental information provided by Kansas City), the processing of Plaintiff's SCI clearance was stopped.[7] Indeed, this is undoubtedly the purpose for requiring that health and psychological concerns communicated to HCPU must also be transmitted to AIU. The lack of SCI clearance did not preclude Plaintiff from being paid or from performing some duties with the Domestic

---

[7]The processing of Plaintiff's SCI clearance was performed by a subunit within AIU. For ease of discussion, the Court will simply refer to AIU as the entity responsible for processing the clearance.

Terrorism Unit. However, his presence in the SCIF was communicated in a variety of ways (including utilization of a blinking light to alert all other personnel) and inconvenienced him (by, for instance, requiring that he be admitted by other employees and be escorted as he traveled within the SCIF).

In the meantime, SAC Truchon had been in contact with Dr. David Wade from HCPU, and thereafter had advised Plaintiff that Dr. Judy Stone (also from HCPU) might be contacting him. ASAC Jackson was also in contact with Dr. Stone, and on September 28 she advised ASAC Jackson that she did not believe it was necessary for her to talk to Plaintiff or for Plaintiff to undergo an FFD. Based on (1) Dr. Stone's statements and (2) observations of Plaintiff since the transfer, ASAC Jackson tried to expedite matters by requesting that the matter be formally closed and that Plaintiff's SCI clearance be issued. This communication – like the Serial 44 – was sent to both HCPU and AIU, but AIU would not act until HCPU formally closed the matter. HCPU did not close the matter until October 3, and AIU did not issue Plaintiff's SCI clearance until early November. The Court credits the testimony of Deputy Assistant Director Brigette Class that the entire sequence of events was relatively quick.

<u>3.</u>

At some point in July, Plaintiff discovered the Serial 44 was available on a shared computer drive and was thus accessible by other employees. He also disagreed with some of the things contained in the Serial 44, so he confronted Schmidt and showed her the Serial 44. Schmidt was concerned that some – but not all – of the statements attributed to her constituted confidential information related to EAP services, so she immediately left her office and contacted ASAC Jones to have the Serial 44 removed from the shared drive. Upon her return Plaintiff asked her about some of the statements attributed to her, particularly those related to his initial meeting with her in June and her statements indicating that she had concerns for her safety. Not wishing to anger Plaintiff, Schmidt lied to him and denied making those statements.

16

## II. DISCUSSION

This Part II may include additional findings of fact, either singly or conjunctively with application of a legal principle. Like the factual findings set forth in Part I, all of these facts are found to exist by the greater weight of the evidence.

### A. Discrimination/Disparate Treatment

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000). Plaintiff can satisfy his burden of proving that he was treated differently than similarly situated women by convincing the Court that either (1) the decisionmakers acted with a discriminatory motive or (2) the decisionmakers' proffered reasons are so unworthy of belief that they were presented to obscure a true discriminatory motive. Either way, the question the Court must answer is virtually the same: was Plaintiff treated differently because of his gender? Cf. United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-15 (1983); Wright v. St. Vincent Health Sys., 730 F.3d 732, 739 (8th Cir. 2013).

In demonstrating he was treated differently because of his gender, Plaintiff must specifically demonstrate the "different treatment" constituted an adverse employment action. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Such action might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects but minor changes are not enough." Rester v. Stephens Media, LLC, 739 F.3d 1127, 1131 (8th Cir. 2014) (internal citations and quotations omitted). This aspect of a discrimination claim presents some difficulties in this case because Plaintiff has complained about *everything* without explaining exactly what he believes constituted an adverse employment action. At the summary judgment stage Plaintiff took the position that he was not required to set forth an adverse employment action, and the Court rejected this argument. Plaintiff also specified four actions he deemed to be adverse

employment actions, but seems to have expanded the universe of actions forming the basis for his claim. The Court will do its best to address those actions (1) that actually constitute adverse employment actions as well as those (2) that Plaintiff has suggested were adverse employment actions.

Finally, there are certain time limits that must be obeyed when bringing a claim of discrimination. A federal employee "who believe[s] they have been discriminated against on the basis of . . . sex . . . must consult [an EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a)(1). This contact must occur "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." Id. § 1614.105(a)(1). See, e.g., Wilkie v. Department of Health & Human Services, 638 F.3d 944, 950-51 (8th Cir. 2011) (claims time-barred if time limits in the regulation are not obeyed). A longer time period is permitted under the circumstances described in 29 C.F.R. § 1614.105(a)(2), but Plaintiff bears the burden of proving he is entitled to the benefit of this provision. Jenkins v. Mabus, 646 F.3d 1023, 1028 (8th Cir. 2011). He has not invoked this provision's application, and the evidence does not support its application. Plaintiff first contacted an EEO Counselor on August 24, 2011; he was notified of his right to file an administrative complaint on September 1, and he filed an administrative complaint on September 7.

### *1. The QSI*

Plaintiff's claim that he was denied a QSI because of his gender fails for two reasons. First, the claim is untimely. Plaintiff learned in late 2010 that he was not getting a QSI, and he did not contact an EEO Counselor within forty-five days. The denial of the QSI is not a "continuing violation" even though it affected Plaintiff's future paychecks because the denial was a discrete, isolated decision and no part of the alleged discriminatory act or decision occurred within the forty-five days before Plaintiff contacted the EEO Counselor. Cf. Betz v. Chertoff, 578 F.3d 929, 937-38 (8th Cir. 2009).

Case 4:13-cv-00729-ODS   Document 85   Filed 05/22/15   Page 18 of 28

Even if Plaintiff's claim regarding the QSI were timely, it would fail because the Court finds the reasons he was not given a QSI were unrelated to his gender. Plaintiff insists (as he does in many other contexts) that SAC Truchon wanted to placate Bulman, but the Court does not find this to be the case. Moreover, it would not matter: even if SAC Truchon wanted to placate Bulman this would not mean SAC Truchon acted based on Plaintiff's gender. In any event, the discussion is beside the point: the Court finds SAC Truchon believed Plaintiff bore some responsibility for the continuation of difficulties on Squad Six and thought it would be wrong to reward him with a QSI.

At the summary judgment stage Plaintiff argued SAC Truchon, ASAC Cataldi, SSA Moore, and other members of the management structure served as Bulman's "catspaw." While not explicitly referencing the theory by name, Plaintiff has persisted in advancing it. The Court takes this opportunity to reject it. "In a cat's paw case, an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action." Bennett v. Riceland Foods, Inc., 721 F.3d 546, 551 (8th Cir. 2013). This theory requires that there be a person possessing both (1) the necessary animus and (2) influence, leverage or control over the decisionmaker, such that it could be said the decisionmaker was acting at the person's bidding. See Qamhiyah v. Iowa State Univ. of Sicence & Tech., 566 F.3d 733, 742-45 (8th Cir. 2009). The catspaw theory is not viable in this case because neither component is satisfied. Most importantly, while Bulman bore animus against Plaintiff, that animus was motivated by the emotions resulting from the breakup of a romantic relationship and was not based on Plaintiff's gender. Thus, no discriminatory intent could be ascribed to the decisionmakers because Bulman had no discriminatory intent, motive, or purpose. In addition, the Court finds Bulman did not have the necessary control over SAC Truchon (or anyone else) to permit application of the catspaw theory. In fact, the Court finds SAC Truchon's reasons for declining to approve Plaintiff for a QSI related to SAC Truchon's assessment of Plaintiff's involvement in creating the unrest on Squad Six.

In this context (and others) Plaintiff invites the Court to reevaluate the factual underpinnings of employment decisions and rule that he was treated unfairly as a

general matter or that others' assessments were incorrect.  For instance, in this context he asks the Court to find that SAC Truchon overstated the extent of Plaintiff's involvement in Squad Six's problems.  The Court declines Plaintiff's invitation.  The Court finds Plaintiff *was* involved, and even if he was not SAC Truchon sincerely believed he was.  "Employers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices.  Federal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'"  Edmund v. MidAmerican Energy Co., 299 F.3d 679, 685-86 (8th Cir. 2002) (quoting Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001)); see also Hill v. St. Louis Univ., 123 F.3d 1114, 1120 (8th Cir. 1997).  The fact-finder cannot rule for Plaintiff simply on a belief that the employer should have handled the situation differently.  E.g., Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 812 (8th Cir. 2005); Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 898 (8th Cir. 2002).

Plaintiff's claim that he was denied a QSI in violation of Title VII is time-barred.  The claim also fails on the merits because Plaintiff's gender played no part in SAC Truchon's decision.


## 2.  Recanvassing for the Principal Relief Supervisor Position


Plaintiff's complaint about the recanvassing for the principal relief supervisor position fails for three reasons.  First, the claim is untimely for the reasons stated previously.  Second, the recanvassing was not an adverse employment action because it did not produce a material employment disadvantage.  Third, the recanvassing occurred because Plaintiff was the only person who responded to the initial posting, and recanvassing is common (if not routine) in such circumstances; the recanvassing had nothing to do with Plaintiff's gender.

### 3. Temporary Change from MST-A to MST

SSA Moore's decision to move Plaintiff from MST-A to MST was not timely raised. In addition, it did not constitute an adverse employment action: a transfer or reassignment of duties is not an adverse employment action if it is not accompanied by a change in salary or benefits. E.g., Holland v. Sam's Club, 487 F.3d 641, 644-45 (8th Cir. 2007); Box v. Principi, 442 F.3d 692, 696 (8th Cir. 2006). Plaintiff may not have liked the reassignment to MST, but it did not affect his salary or benefits. Finally, SSA Moore did not move Plaintiff to MST because he was a male; he moved Plaintiff to MST because he was trying to minimize the conflict he perceived on Squad Six, and it is not the Court's role to decide whether SSA Moore should have transferred Bulman to MST instead.

### 4. The Mediation

Plaintiff has expressed outrage and indignation over the attempted mediation in February 2011, complaining quite strenuously that Bulman "got a mediation" without filing an EEO complaint. The Court is not certain if Plaintiff asserts this as an adverse employment action, but if he does the Court holds it is not one. Plaintiff suffered no tangible change in employment from this attempt to resolve the problems on Squad Six or from his refusal to participate. The Court also holds the FBI's attempt to mediate the dispute was not unusual and, more importantly, not done because of Plaintiff's gender. Finally, any claim predicated on the February 2011 mediation attempt is time-barred.

### 5. Transfer to Domestic Security and Related Events

Plaintiff's claim that his transfer to Domestic Security violated Title VII is time-barred; he was told of the transfer in late June 2011 and did not contact an EEO Counselor within forty-five days. Plaintiff's claim also fails because it is not an adverse employment action: the transfer to the Domestic Terrorism Unit did not cause Plaintiff to lose any pay, nor did it effect other tangible changes that could be characterized as

21

adverse within the meaning of cases defining the concept. Plaintiff correctly contends the transfer diminished his opportunities to fly, but Plaintiff did not receive extra pay for flying. Flying was simply another job duty, and a change of duties – desirous though they may be – does not constitute an adverse employment action. The Court ultimately is not convinced that the transfer adversely affected Plaintiff. Finally, even if the claim were timely presented, and even if the transfer was an adverse employment action, Defendant would prevail because Plaintiff's gender played no part in SAC Truchon's decision to transfer him. SAC Truchon regarded Plaintiff as having more responsibility for the personal conflict between Plaintiff and Bulman. The Court is not empowered to second-guess the wisdom of SAC Truchon's decision as to how best to resolve the problem and decide Bulman was more deserving of a transfer or that both employees should have been transferred. SAC Truchon's interpretation of the situation was sincerely held and was not a pretext for discrimination. And, for the reasons stated in Part II.A.1, Plaintiff's catspaw argument is unavailing. Even if Bulman exaggerated or lied, she lacked sufficient control over SAC Truchon to justify the catspaw theory. More importantly, Bulman lacked the necessary intent. She may have hated Plaintiff; she may have desired that something happen to him; she may have wanted him to be unhappy; she may have sought a measure of revenge for Tonda's OPR complaint or the message Tonda sent to Meriano – but none of these objectives had anything to do with Plaintiff's gender. At the absolute best, if SAC Truchon was Bulman's catspaw (and he was not, because she lacked the necessary control over him), he was Bulman's instrument for revenge for the relationship's aftermath and the actions (real and perceived) Plaintiff and Tonda took – not an instrument for Bulman's gender discrimination.[8]

---

[8]Plaintiff himself suggested that the Court find that "[a]ccording to SAC Truchon, Sean Edwards' inability to control his wife was one of a series of things that lead to the transfer . . . ." Doc. # 63, ¶ 10. The Court agrees that Tonda's actions played a significant role in SAC Truchon's decision to transfer Plaintiff. See Part I.H.1, infra. Interestingly, this fact proposed by Plaintiff defeats his claim of discrimination, because this fact suggests SAC Truchon acted for reasons unrelated to Plaintiff's gender. Title VII does not prohibit transferring a person because of their spouse's interference in the workplace.

The FFD inquiry and resulting delay in Plaintiff's SCI clearance do not constitute gender discrimination. The SCI clearance was denied for reasons completely unrelated to his gender; namely, the FFD inquiry. The FFD inquiry was initiated for reasons completely unrelated to his gender; namely, the combined observations and perceptions of numerous people including (but not limited to) Kenser, Schmidt, Contess, and Bulman. Plaintiff wants the Court to evaluate this information and deem some of it untrue and conclude that the FFD inquiry should not have been conducted – but this endeavor falls outside of Title VII. It may have been a bad decision; it may have been a decision unduly affected by Bulman's venomous feelings toward Plaintiff – but then again, it might not. As stated earlier, the Court is not empowered to substitute its sense of proper human relations protocol and decide whether the action was right or wrong. All Title VII permits the Court to determine is whether Plaintiff's gender played a role in these events, and the Court concludes it did not.

### 6. Bulman's Treatment

Plaintiff also complains that Bulman received better treatment than him and other employees. Plaintiff cannot assert a claim that Bulman received better treatment than other employees, so the Court will not address this issue further (other than to say that Bulman and the "other employees" were not similarly situated). His comparisons of Defendant's treatment of him versus Bulman are primarily summarized as a complaint that SSA Moore, ASAC Cataldi, SAC Truchon and others believed Plaintiff or took her side in disputes. There is no evidence that these actions occurred because of Plaintiff's gender, so these complaints will not entitle Plaintiff to relief.

Within these contentions Plaintiff also seeks relief because Bulman was allowed to violate various regulations. Plaintiff can only obtain relief for actions taken against him, and he identifies no instance where the evidence demonstrates he and Bulman were similarly situated and he suffered an adverse employment action while Bulman did not. The closest Plaintiff comes to demonstrating such a circumstance involves the FBI's denial of his request to engage in outside employment as a firearm's instructor in Tonda's business. This decision was made by someone at HQ in Washington.

23

However, Bulman was not similarly situated to Plaintiff because she never asked for permission to engage in outside employment, much less employment as a firearm's instructor. Plaintiff basically argues that he was not allowed to work in Tonda's business but Bulman worked at The Spott – but they were not similarly situated because Bulman did not ask for and receive permission to do so. Bulman was not disciplined for engaging in unauthorized employment because Errington investigated the matter and determined she was not working at The Spott. It may be (as Plaintiff suggests) that Errington could have done more to investigate the matter, but (1) there is insufficient evidence for the Court to find Bulman actually worked at The Spott, (2) the Court finds Errington sincerely believed Bulman did not work at The Spott, (3) Title VII does not provide a basis for the Court to evaluate the quality of Errington's investigation, and – most importantly – (4) Plaintiff's gender had nothing to do with any of these events.

## B. Hostile Work Environment

Plaintiff has attempted to litigate a hostile work environment claim. The theory was advanced in Plaintiff's Response to Defendant's Motion for Summary Judgment, e.g., Doc. # 44 at 1, 12, 93-98, in Plaintiff's opening statement, and Plaintiff's testimony. The initial problem with this is that Plaintiff may not have pleaded a hostile work environment claim. Defendant points out Count I of the Complaint is captioned "Discrimination on the Basis of Sex" and Count II is captioned "Retaliation," and objects to any consideration of a hostile work environment claim. Curiously, Plaintiff has completely failed to address this issue at any juncture. Nonetheless, the Court is not entirely convinced Defendant is correct – but rather than resolve this issue the Court holds that even if the claim has been presented Defendant prevails on the merits.

Paragraphs 18 through 22 in the Complaint appear under the heading "QSI, hostile work environment, protected acts and Gag Order." Paragraphs 18 and 22 allege that certain events created a hostile work environment. Count I incorporates these allegations by reference by virtue of Paragraph 55, and concludes by alleging that all of Defendant's actions caused Plaintiff harm. So the question is: is Count I limited to its

title and therefore alleging just a claim for "discrimination" or does it include a claim for "hostile work environment" – and if the former, what is encompassed within a claim of "discrimination?" Defendant focuses on Count I's title to suggest that Count I asserts only a disparate treatment claim, but Count I's title says "discrimination," not "disparate treatment," and a hostile work environment is a form of – or a subset of – discrimination. E.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Thus, it is conceivable that Count I should be construed as setting forth two different theories for a discrimination claim: a theory predicated on disparate treatment and a theory predicated on a hostile work environment.[9] As the Eleventh Circuit held in a very similar situation, "[w]hile it may well be preferable to plead different theories of recovery in separate counts, it is not required." Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1247 (11th Cir. 2004) (holding, *based on content of the pleadings*, that single count entitled "Violation of Title VII" raised both a claim premised on a tangible employment action and a claim premised on hostile work environment). Neither party has delved this far into the issue, and while the Court is troubled by Plaintiff's failure to address the issue at any juncture the Court is disinclined to delve further on its own because if a hostile work environment theory has been validly advanced it is quite clear Plaintiff loses on the merits.[10]

---

[9]Rule 8(d)(2) says that "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones," and while the theories of hostile work environment and disparate treatment are not "alternative" or "hypothetical" within the meaning of the Rule, the Rule still evinces a willingness to contemplate multiple theories within a single count.

[10]If Plaintiff did not properly plead a theory based on a hostile work environment, that probably ends the matter. Rule 15(b)(2) permits a party to move to amend the pleadings to conform to the evidence, but Plaintiff never made such a motion. The Rule also provides that if "an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Defendant did not object to any evidence on the ground that it was beyond the pleadings, but most if not all such objections would have been overruled because the evidence would have been relevant to Plaintiff's disparate treatment claim. On the other hand, Defendant presented its argument regarding the pleadings before trial started, so the Court would be hard-pressed to hold that any claims not in the pleadings were tried with Defendant's consent. See Trip Mate, Inc. v. Stonebridge Cas. Ins. Co., 768 F.3d 779, 784-85 (8th Cir. 2014). As the Court is not fully resolving the pleading issue and is instead ruling in Defendant's favor on the merits, there is no need to consider whether

To prevail on his hostile work environment claim, Plaintiff must prove that (1) he belongs to a protected group, (2) he was subject to unwelcome harassment based on his gender, (3) the harassment affected a term or condition of his employment, (4) the FBI knew or should have known about the harassment, and (5) the FBI failed to take action.  E.g., Rickard v. Swedish Match N. Am., Inc., 773 F.3d 181, 184 (8th Cir. 2014); Jackman v. Fifth Judicial Dist. Dep't of Correctional Servs., 728 F.3d 800, 805-06 (8th Cir. 2013).  Plaintiff contends the animosity directed toward him by other agents on Squad Six and his superiors constituted a Title VII violation.  For the sake of argument, the Court will assume elements one, three, four and five have been satisfied.  The Court will also assume – purely for the sake of discussion – that the abuse, ridicule, and intimidation was so severe and pervasive that it affected the terms and conditions of Plaintiff's employment.  See Dattoli v. Principi, 332 F.3d 505, 506 (8th Cir. 2003).  Plaintiff's claim fails because there is no proof that any of the harassment was based on his gender.  There was animosity between members of the ground crew and the pilots (including Plaintiff), predicated on the views of some on the ground crew that the pilots did not work as hard.  There was animosity against Plaintiff because it was suspected or revealed that he had reported another agent was drinking in his FBI car.  There was evidence of personal animosity between Contess and Plaintiff.  And, of course, there was the animosity and anger from Bulman arising (minimally) from the end of her relationship with Plaintiff and Tonda, from Tonda's filing of the OPR complaint, and from Tonda's contact with Meriano.  So, even if Plaintiff's workplace was filled with sufficient animosity, ridicule and abuse to affect the terms and conditions of Plaintiff's employment such that it could be deemed he was in a "hostile work environment," *none* of it was based on his gender.  Therefore, his hostile work environment claim fails on the merits.

---

the pleadings could validly be amended to include the claim (assuming, of course, that such a maneuver were necessary).

26

A prima facie case of retaliation under Title VII requires proof that the Plaintiff engaged in conduct protected by Title VII, the employer took an adverse employment action, and the adverse employment action was causally related to the protected activity.  E.g., Tolen v. Ashcroft, 377 F.3d 879, 883 (8th Cir. 2004); Hunt v. Nebraska Public Power Dist., 282 F.3d 1021, 1028 (8th Cir. 2002).  By and large, Plaintiff's claim is time-barred for the reasons previously stated.  However, more fundamentally, the Court finds that no adverse employment action[11] was causally related to activity protected by Title VII.  The first time Plaintiff engaged in activity protected by Title VII was when he contacted an EEO Counselor in August 2011.  Obviously, nothing that happened before that date could have been causally related to his first protected act, and thereafter nothing more "happened" to Plaintiff.  True, the FFD inquiry and the SCI clearance remained outstanding, but those decisions were in the hands of people who were unaware of Plaintiff's protected activity.  In any event, the Court finds that the FFD inquiry and SCI clearance were handled in a normal and expedient fashion, and there was no delay attributable to Plaintiff's contact with the EEO Counselor.

Plaintiff steadfastly insists that action was taken against him for reporting Bulman's violations of FBI regulations, but reporting violations of FBI regulations is not activity protected by Title VII.  Plaintiff also suggests he was the subject of retaliation for complaining about Bulman generally, but Title VII also does not protect an employee's right to complain about co-workers.  Plaintiff registered no complaints about discrimination, and engaged in no other activity protected by Title VII, until August 2011.[12]

---

[11]The Court's ruling makes it unnecessary to consider whether anything constituted an adverse employment action under the different/lesser standard applicable to retaliation claims pursuant to Burlington N. & Santa Fe Railway v. White, 548 U.S. 53 (2006).

[12]It is also worth noting that the Court's findings regarding the reasons for all of the actions taken provide an independent basis for concluding Plaintiff was not subject to unlawful retaliation in violation of Title VII.

27

<u>III.  CONCLUSION</u>

The Court finds in Defendant's favor.  Judgment shall be issued accordingly.

IT IS SO ORDERED.


/s/ <u>Ortrie D. Smith</u>
ORTRIE D. SMITH, SENIOR JUDGE
DATE: May 22, 2015                    UNITED STATES DISTRICT COURT